Leon E. Whipple
vs.            } Eq. No. 508.
Minnie L. Titus

March 5, 1934.

BAKER, P. J. Heard on bill, answer in the nature of a cross-bill, and proof.

The complainant's bill asks that his title be confirmed in and to the premises described in his bill; that a certain deed of the respondent be cancelled so as to remove any cloud upon the complainant's title; that the respondent be enjoined from interfering with the complainant's possession of the premises in dispute; that the complainant's title may be confirmed by reason of adverse possession in the complainant and his predecessors in title for a period of more than ten years, and for further relief in connection with the above specified prayers.

The answer of the respondent denies the material allegations of the bill and sets up new matter relating to a certain ejectment proceeding, and further prays that a decree be entered declaring that the respondent alone is the owner of the premises in dispute; that the complainant be enjoined from interfering with her use and occupation and that the cloud upon the title of the respondents be removed.

The sole question presented for determination relates to the ownership of a very small lot situated in the Town of Warwick on the shore of Brush Neck Cove. The premises in dispute are located between a driftway and the shore and consist of a rather narrow strip of land, irregular in shape and varying in width and partly tide-flowed. On this lot is a small two-room summer house built on piles over the water. The front portion of the building is the only part on the lot proper. Each party has presented for the consideration of the Court a paper title, and the difficult question on this phase of the case is really an engineering problem as to where certain boundary lines run or should be located.

The evidence shows that the complainant's title in its present form originated in 1914. At that time the Watsons, real estate promoters, purchased a tract of land in Warwick, near Brush Neck Cove, from the Eversons. This property was surveyed and platted into lots and was known as the Oakland Heights Plat. The property in dispute appears on this plat as lot No. 209, which was later conveyed to the complainant's father and in turn came into the possession of the complainant. The lot in question is practically the southernmost lot on the aforesaid plat. This property which was conveyed to the Watsons had formerly been known as the Hutchins land. The property was irregular in shape and a small portion extended southerly between a driftway and the shore of Brush Neck Cove. In the conveyance from the Eversons to the Watsons the following language was used as creating the southerly boundary of the property conveyed, viz: "thence easterly bounding southerly on said 'Crins Plat' passing through a granite stone bound set on the division line about 35 feet to Sea View drive, so called; thence northerly, &c."

The title of the respondent is derived from the Wilcoxs and is a more ancient title than that of the complainant. For many years the Wilcox family owned a portion of the Neck known as The Horse Neck, which included the land in question, and the farm there was named The Horse Neck Farm. It would seem that the driftway above referred to was created about 1872 in order to connect two separated parcels of land which were then owned by the same person. About 1879 there was a partition of the Wilcox farm and a plat was filed. This plat shows a small strip of land lying between the driftway and Brush Neck Cove. It is very difficult from the evidence and from the plats to determine the exact location of the driftway, which apparently was not much more than a cart path. It is clear that the line between the Crin plat and the property to the north is the original division line between lots 4 and 6 on the partition plat of the Wilcox farm. Lot No. 4 which lay north of what was later the Crin plat came to John T. Wilcox. This lot, or a portion of it, subsequently came into the possession of Dr. Long, who platted it and later conveyed to one McGarry. Neither Long nor McGarry, however, received any property between the driftway and the shore but bounded on the driftway.

The claim is made on behalf of the respondent that a portion of this strip between the driftway and the shore of Brush Neck Cove, including the lot in dispute, came to Herbert A. Wilcox, who later conveyed to the respondent.

A portion of the northerly line of said lot No. 4 in the Wilcox partition bounded upon what was known as the Hutchins property, later conveyed by the Eversons to the Watsons. This line between the Hutchins property and the Wilcox property, according to the testimony, is a very ancient line, being perhaps more than 200 years old. There is practically no dispute as to the location of the portion of this line which is straight. The difficulty comes in determining the exact location of the line when it turns and runs southerly along the shore of Brush Neck Cove. The complainant contends that it extends southerly as far as the boundary between lots 4 and 6 in the Wilcox partition and as far as what was later known as the Crin Plat. No such description, however, appears in any conveyance until the conveyance by the Eversons to the Watsons in 1914. The respondent claims that this line in question runs southerly for some considerable distance along the shore of Brush Neck Cove but falls short by a hundred feet or more of reaching the division line between lots 4 and 6 of the Wilcox partition, thereby leaving a small piece of land along the shore still in the Wilcox family. These are the premises in dispute. Previous deeds have bounded the Hutchins land southerly by land now or formerly of Jonathan Wilcox.

An examination of the old deeds, as evidenced by the testimony of Mr. Ball, tends to show that the ancient line between the Hutchins and the Wilcox property turned south for a distance of 363 feet and then ran a distance of 379½ feet to the center of the channel of Brush Neck Cove. It would seem that if these distances are approximately correct, the southerly line of the old Hutchins property would not extend as far south as the Crin Plat, so-called, or the division line between lots 4 and 6 in the Wilcox partition, but would extend southerly to a point not far from the north line of the property in dispute in this case and then would run westerly to the center of the channel of the cove.

Herbert Wilcox, in testifying, says that he has lived in this neighborhood

for many years and that his grandfather owned The Horse Neck Farm. He says that he remembers an old water fence projecting from the shore into the waters of the cove, and also refers to a spring in this general neighborhood. He says that this division fence was at least 100 feet short of the property known as the Crin Plat. It would tend to appear that the fence has been down for some considerable time but it is not clear who removed it.

From the deeds and plats presented in evidence and from the oral testimony, it seems clear to the Court that the title through which the respondent claims is by far the more ancient of the two record titles. It seems reasonably clear that when the Watsons had their property surveyed and platted following the purchase from the Eversons, the surveyor, probably through inadvertence or through difficulty in locating ancient lines, extended the Watson plat a little too far to the south, thereby including in it the disputed premises. In the judgment of the Court, the true southerly boundary of the Watson plat at this point is approximately at the northerly line of the premises delineated as lot No. 209.

The complainant contends that the fact that there is a stone bound in the line between the Crin plat and the property at the north shows that the Hutchins property extended that far to the south. This does not seem to the Court to follow necessarily. It is not shown who set the stone bound in question and it merely appears that the Watsons' surveyor found it already located. As a matter of fact, it seems reasonable to assume that this stone bound probably marked the division line between lots 4 and 6 in the Wilcox partition which was made in 1879.

The burden, of course, is on the complainant herein to establish his record title by a fair preponderance of the testimony. It does not seem to the Court that he has sustained this burden. On all the testimony presented, the Court is of the opinion that of the two record titles, the respondent, claiming through the Wilcoxs, has shown the better.

The complainant also urges that the case at bar falls within the rule of the line fence cases as exemplified by the decision of the Court in the case of *O'Donnell* vs. *Penny*, 17 R. I. 164.

After giving this point consideration, the Court believes that the rule laid down in the above case is not applicable to the situation as presented by the testimony in the case now before the Court. There is no direct evidence which shows that the stone bound hereinbefore referred to has been recognized or acquiesced in by the owners of the premises in dispute as marking the true line between the Wilcox property and the Hutchins property. It probably marked the northern line of lot No. 6 of the Wilcox partition, but it does not necessarily follow that it also marked at the same time the southern line of the Hutchins land. In fact, the Court is of the opinion that it did not.

The next question relates to the complainant's claim that he has good title to the property in question by reason of the adverse possession of himself and his ancestors in title.

This claim is based substantially on the following facts: the evidence shows that the Watsons bought their property in 1914 and had it surveyed and platted; that the lots, including lot No. 209, were staked out with surveyor's stakes. The Watsons themselves were on the land off and on, selling lots and also had salesmen there for some little time. In 1920 Mr. Watson entered into a contract of sale with the complainant's father in

connection with lot No. 209, and certain payments were made on said lot; and in June 1921, the lot in question was conveyed to the complainant's father. Brush and some trees were cut by the complainant or his father on the lot about this time. In April or May 1921, the small house was built. Early in 1927, the complainant's father died and in the same year the complainant permitted a man named Coutu to occupy the house under some understanding that the latter would purchase the property. The testimony discloses, however, that very little, if any, money was paid by Coutu. He did improve the place to some extent and filled in a portion of the lot. The complainant urges that this state of facts shows that even if the paper title of the complainant may not be good, nevertheless he has acquired the disputed premises by adverse possession.

In answer to this claim of the complainant, the respondent presents the following facts as showing that this claim of adverse possession can not successfully be maintained. Mr. Wilcox says that he has been very familiar with this location for many years; that after the Watsons purchased their property from the Eversons, he was on the disputed premises at least several times a year for various purposes. He also says that until the house was built in 1921, he took thatch from the shore every year. He says that he objected to the complainant and his father when the house was erected and himself stated that he claimed to own the land, but at that time did nothing further than make the oral claim. There is testimony that not long after the small house was built, it fell in, owing to the action of the water upon the posts, and remained in that condition for some considerable time. It is difficult to fix the dates but Mr. Wilcox, in his evidence, says that he thinks it remained in this abandoned and disused condition for about five years. Mr. Whipple says that his father had him fix the house up and as his father died early in 1927, the house probably must have been fixed up some time in 1926. It seems likely from all the evidence that the house fell in some time in 1922 or 1923 and remained in that condition until some time in 1926. The testimony discloses that after the house fell in, it was in poor condition; that the windows and doors were out; that it was uninhabitable and that to all appearances it had been abandoned. In December 1928, Mr. Wilcox conveyed the property to the respondent. This was about a year and a half after Mr. Coutu had fixed the place up and moved in. The evidence then discloses that the respondent attempted to collect rent from Mr. Coutu, without success, and early in 1930 commenced ejectment proceedings against him in the Fourth District Court. In this case there was a decision for the respondent herein against Mr. Coutu, from which no appeal was taken, and an execution was issued. In 1931 the present bill was brought by the complainant. The evidence also discloses that the taxes on the disputed premises have been paid by Mr. Wilcox and the respondent but never by the complainant or his father.

The respondent claims that the ejectment proceedings in which the respondent was successful against Mr. Coutu constitute res adjudicata in connection with the question of title now before the Court. It is true that undoubtedly some of the same issues were before the district court in that proceeding as are now before this Court, but the complainant herein was not a party to that proceeding and the Court does not feel that the respondent can urge the defence of res adjudicata to this bill.

The law is well settled that in order to have a title acquired by adverse possession the evidence must be clear and definite to support such a claim. After weighing carefully the testimony in the case at bar, the Court has come to the conclusion that the evidence of continuous and uninterrupted user of the premises in question by the complainant and his ancestors in title is not sufficiently clear to warrant the Court in holding that the complainant now has title to the property in question through adverse possession.

During the period from 1914 to 1920, it would seem that both the Watsons and Mr. Wilcox were making use of the property. There is no question but that the Watsons, by staking the lot out and by going upon the premises, made an open and adverse claim, but at the same time Mr. Wilcox was cutting thatch and was making such use of the premises as he saw fit. Of course, the erecting of the building in 1921 by Mr. Whipple was a clear and open act of user, but it seems plain from the evidence that this building collapsed in 1922 or 1923 and the testimony would seem to show reasonably clearly that it was practically abandoned until 1927. If an adverse possession had been started, the chain would appear to have been broken during this period. Since 1927, when Mr. Coutu fixed the house up and moved in, not sufficient time has elapsed for the acquiring of rights. The ejectment case was brought in 1930 and the present bill was brought in 1931.

Taking all the evidence of user together, the Court does not feel that it has been so continuous and so uninterrupted on the part of the complainant and his ancestors in title as to justify a finding that a title by adverse possession has been acquired by the complainant.

In the cases cited to the Court by the complainant, such as:

Dodge vs. Latvin, 34 R. I. 409;

Carpenter vs. Logee, 24 R. I. 383;
New Shoreham vs. Ball, 14 R. I. 566, and

Saunders vs. Kenyon, 52 R. I. 221, is clear that the user was uninterrupted and continuous for more than the statutory period. In this case the acts of user were undoubtedly sufficient but they do not appear to the Court to have been continuous and uninterrupted.

The Court is therefore of the opinion that the complainant has not been successful in establishing title to the premises in question in himself by adverse user.

In connection with this claim of the complainant, the respondent calls to the attention of the Court the general rule of law that a person is not entitled to relief under a bill of this type where the evidence shows merely a bare claim of title by adverse possession without any color of title and without substantial equities. This general doctrine has been recognized by the Courts in this State.

Day vs. Proprietors of Swan Point Cemetery, 51 R. I. 213;

Taylor vs. Staples, 8 R. I. 170.

In view of the fact, however, that the Court herein has determined that, on the evidence presented, the complainant has not proved title by adverse possession, this question raised by the respondent does not become very material.

In regard to the affirmative relief asked for in the respondent's answer in the nature of a cross-bill, the complainant contends that no relief should be granted. The attention of the Court is called to the following cases:

Campbell vs. Point Street Iron Works, 12 R. I. 452;

Burdick vs. Burdick, 14 R. I. 574.

In the first of these cases, the Court says:

"Without doubt, by the old English law and statutes, which must be con-

sidered as being a part of our common law, a conveyance of land of which the grantor was not in possession was void, and the title remained in the grantor."

In the second case, the Court says:

"* * * the Court below found as a matter of fact that the land in suit was in the adverse possession of the defendants at the time the deed from Horatio N. Kenyon, under which the complainants claimed title to it, was executed, and thereupon decided that the deed was ineffectual to pass the legal title. The decision was in accordance with the law as it has been frequently recognized by this Court."

The evidence in this case shows that when the deed from Mr. Wilcox to the respondent was made and executed in the latter part of 1928, the premises in question were being used and occupied by Mr. Coutu, apparently under the complainant and adversely to Mr. Wilcox. The evidence further showed that Mr. Coutu had been in occupation since early in 1927. In view of this situation, it would appear that the rule of law laid down in the above cases would be applicable. If this is so, a serious question would be raised as to what the respondent received, if anything, under the deed from Mr. Wilcox.

After giving this question careful consideration, the Court has come to the conclusion that, for the reasons aforesaid, the respondent in this case is not in a position to ask for affirmative relief against the complainant.

On the whole case, therefore, the Court is of the opinion that neither party is entitled to the relief prayed for under the present bill and answer, and that both the original bill and the answer in the nature of a cross-bill should be denied and dismissed.

For complainant: Knauer & Fowler.

For respondent: William B. Sweeney.